OPINION
{¶ 1} On March 7, 2002, a Franklin County grand jury indicted Mark G. Hayes on nine felony counts related to alleged burglary and robbery offenses whose victims were students residing in dormitories at the Columbus campus of The Ohio State University ("OSU"). Specifically, Hayes was indicted on the following charges arising from three separate incidents in January and February of 2002: two counts of aggravated robbery, felonies of the first degree, in violation of R.C. 2911.01; three counts of burglary, felonies of the second degree, in violation of R.C. 2911.12; and four counts of robbery, in violation of R.C. 2911.02. The robbery counts were indicted both as two second-degree felonies and two third-degree felonies. In addition, several counts carried firearm specifications. Prior to the trial in this case, the prosecution dismissed one of the aggravated robbery charges, in addition to several firearm specifications.
 {¶ 2} In short, the charges lodged against Mr. Hayes stemmed from three incidents involving variations of a common scheme: Hayes purportedly approached OSU students, offered to sell them computer game consoles (i.e., "Playstation 2s" and "XBoxes") at a bargain price, and ultimately "scammed" them of their money without giving them the items. The particulars of the charges are discussed below in detail.
 {¶ 3} The case proceeded to a jury trial in June 2002. The jury returned guilty verdicts as to the three counts of burglary and two counts of robbery. The robbery verdicts included one count charged as a second-degree felony and the other a third-degree felony. The jury could not reach a unanimous decision as to the three remaining counts; accordingly, the trial court declared them "hung" via its sentencing entry journalized August 2, 2002. Appellant was not convicted of any firearm violations.
 {¶ 4} The trial court sentenced Mr. Hayes to concurrent five-year prison terms on each of the five counts of which he was convicted.
 {¶ 5} Mark G. Hayes ("appellant") has timely appealed, assigning six errors for our consideration:
 {¶ 6} "Assignment of Error No. 1:
 {¶ 7} "Defendant-Appellant's convictions for two counts of robbery are not supported by evidence sufficient to satisfy the requirements of due process under U.S. Const. amend. V and XIV; or, alternatively, are against the manifest weight of the evidence.
 {¶ 8} "Assignment of Error No. 2:
 {¶ 9} "Defendant-Appellant's convictions for three counts of burglary are not supported by evidence sufficient to satisfy the requirements of due process under U.S. Const. amend. V and XIV.
 {¶ 10} "Assignment of Error No. 3:
 {¶ 11} "Defendant-Appellant was denied his rights under state law as well as his right to due process of law and to a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. I, § 16 as a result of prosecutorial misconduct during cross-examination and closing arguments to the jury.
 {¶ 12} "Assignment of Error No. 4:
 {¶ 13} "The court of common pleas committed error prejudicial to Defendant-Appellant and denied him his right to due process and a fair trial under U.S. Const. amend. V and XIV when it permitted the prosecution over objection to elicit extensive hearsay testimony of other robberies allegedly committed by him.
 {¶ 14} "Assignment of Error No. 5:
 {¶ 15} "The court of common pleas committed plain error prejudicial to Defendant-Appellant and denied him his right to due process and a fair trial under U.S. Const. amend. V and XIV when it gave the jury defective and incomplete instructions of law.
 {¶ 16} "Assignment of Error No. 6:
 {¶ 17} "Defendant-Appellant was denied his right to the effective assistance of counsel guaranteed to him under U.S. Const. amend. VI and XIV."
 {¶ 18} The assignments of error, particularly the first and second, require a thorough review of the evidence adduced at trial.
 {¶ 19} By his first assignment of error, appellant contends that there was insufficient evidence to sustain his two robbery convictions or, alternatively, that the convictions were against the manifest weight of the evidence. Appellant's second assignment of error challenges as insufficient the evidence underlying his burglary convictions. We address these assignments of error jointly.
 {¶ 20} The standards by which we are bound in addressing these assignments of error are set forth below.
 {¶ 21} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
 {¶ 22} "With respect to sufficiency of the evidence, `sufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 ***. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, *** citing Jackson v. Virginia (1979),443 U.S. 307 ***.
 {¶ 23} When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
 {¶ 24} "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
 {¶ 25} In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
 {¶ 26} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 ***. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 27} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 ***. See, also, State v. Martin (1983),20 Ohio App.3d 172, 175 *** (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."
 {¶ 28} Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offenses, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
 {¶ 29} Appellant contends that the prosecution failed to prove by sufficient evidence the elements of the two robbery offenses of which he was convicted or, alternatively, that the robbery convictions were against the manifest weight of the evidence. Appellant also challenges as insufficient the evidence underlying his three burglary convictions.
 {¶ 30} The elements of the four statutorily-defined forms of burglary are set forth in R.C. 2911.12 as follows:[1]
 {¶ 31} "(A) No person, by force, stealth or deception, shall do any of the following:
 {¶ 32} "(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense.
 {¶ 33} "(2) Trespass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense.
 {¶ 34} "(3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure * * * any criminal offense;
 {¶ 35} "(4) Trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present."
 {¶ 36} For purposes of the state's burglary theories, appellant was alleged to have acted with "deception," defined by R.C. 2913.01(A) as follows:
 {¶ 37} " `Deception' means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."
 {¶ 38} The next critical element, "trespass," is defined by R.C. 2911.21, as follows:
 {¶ 39} "(A) No person, without privilege to do so, shall do any of the following:
 {¶ 40} "(1) Knowingly enter or remain on the land or premises of another;
 {¶ 41} "(2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows he is in violation of any such restriction or is reckless in that regard;
 {¶ 42} "(3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender * * * or by posting in a manner reasonably calculated to come to the attention of potential intruders * * *;
 {¶ 43} "(4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant * * *."
 {¶ 44} Significantly, the criminal trespass statute expressly provides that "[i]t is no defense * * * that the offender was authorized to enter or remain on the * * * premises involved, when such authorization was secured by deception." R.C. 2911.21(C).
 {¶ 45} Finally, with respect to the penalty provisions of the burglary statute, a violation of division (A)(1) or (2) is a felony of the second degree.[2] The lesser offenses set forth in division (A)(3) and (A)(4) are, respectively, felonies of the third and fourth degree. R.C. 2911.12(C).
 {¶ 46} We address the remaining elements of the burglary provisions, in our discussion of appellant's primary argument in challenging the sufficiency of the evidence upon which these convictions were based.
 {¶ 47} The elements of robbery are set forth in R.C. 2911.02
as follows:
 {¶ 48} "(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 49} "(1) Have a deadly weapon on or about the offender's person or under the offender's control;
 {¶ 50} "(2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
 {¶ 51} "(3) Use or threaten the immediate use of force against another."
 {¶ 52} Violation of R.C. 2911.02(A)(1) or (2) robbery is a second-degree felony; violating division (A)(3) is a third-degree felony. R.C. 2911.02(B). As discussed above, appellant was convicted of one count of second-degree robbery and one third-degree robbery under divisions (A)(2) and (A)(3).[3]
 {¶ 53} We look now to the evidence adduced at trial.
 {¶ 54} The first set of charges involved OSU sophomore David Lageman whom the jury by its verdict found to be the victim of one count of burglary, one count of second-degree robbery and one count of third-degree robbery.
 {¶ 55} Mr. Lageman testified that he first encountered appellant when appellant came to his dormitory room during the early afternoon of Friday, January 11, 2002. Lageman resided at Blackburn House, located at 120 West Woodruff Avenue on the OSU campus. Lageman agreed with the prosecution's characterization of Blackburn House as a "secured facility," explaining that residents have key cards to gain entrance and that the front-door entrance is usually monitored by someone to assist visitors.
 {¶ 56} According to Mr. Lageman, he was on his computer, with the "door cracked," when appellant "entered and just kind of like quick knock[ed] and opened the door." (Tr. 84.) Appellant explained to him that "he did have a key card and that he would show me but he said he lost it somewhere, he left it somewhere * * *." (Tr. 86.)
 {¶ 57} Mr. Lageman testified that appellant told him that he had a friend who was selling computer game consoles (Playstation 2s and XBoxes). According to Lageman, he asked appellant if they were stolen and appellant said they were not. The two agreed on a price of $170 for certain items — a game console and some game cartridges. Lageman recalled that appellant might have made a phone call from his dorm room. Appellant told him that they had to meet his friend at a nearby UDF convenience store, where his friend would bring the merchandise. Lageman told him he needed to withdraw money at the ATM there. The two men walked to the UDF, Lageman withdrew money, and appellant made a phone call. For reasons unknown to Lageman, they then went to a nearby Shell gas station, where appellant made another call. The two then walked back to the UDF.
 {¶ 58} Approximately five minutes later, a man pulled up in a Dodge Intrepid. The driver's window was open, and appellant told Mr. Lageman to give the driver the money. Lageman gave him the $170. Appellant got a bag out of the car's trunk and handed it to Lageman. Lageman immediately realized that there was nothing in the bag except cardboard.
 {¶ 59} According to Mr. Lageman, he said that he "didn't want anything to do with this" and asked for his money back. As appellant was getting into the passenger side of the Intrepid, appellant said to the driver, "Get the gun and blast him, blast him, blast him." (Tr. 87-88.) Lageman was scared, so he ran. Appellant and his friend in the Intrepid then sped away.
 {¶ 60} Mr. Lageman ran to a nearby Donato's Pizza, where he saw two men outside. As he was running away, he just "threw away the box or bag." The men asked him if he was all right and he said, "yeah." Lageman asked the men "if they got a license plate number," and they told him they had not. Lageman then went to his "dorm real quick and ran to class, told [his] professor that [he] wasn't going to be able to make it and called police." (Tr. 88, 98.) He gave statements to both OSU and Columbus police.
 {¶ 61} A few weeks later, Mr. Lageman viewed a photo array and identified appellant as the man who "robbed" or helped to rob him. Lageman also made an in-court identification of appellant. However, since appellant conceded that he was a party to a transaction involving his friend and Lageman, albeit of a different nature, defense counsel stipulated to the identification. As discussed below, through his own trial testimony, appellant's version of events, not surprisingly, differed in several critical respects.
 {¶ 62} On cross-examination, Mr. Lageman clarified that he had "no clue" how appellant entered the residence hall before knocking at the "already cracked * * * open" door to his room. Lageman also expressly stated that at no time did he ask appellant to leave the residence hall or his dorm room. (Tr. 105.)
 {¶ 63} As to the particulars of the brief "transaction" that occurred among the three men, Mr. Lageman's answers upon cross-examination are replete with claims of memory problems, citing the "five or six months" time period since the event and his desire "to forget" the matter. When asked to refresh his recollection with a statement he wrote and provided to police a few weeks after the event, Lageman acknowledged that he wrote that he did not run away from the car until after the car sped off first.
 {¶ 64} As indicated infra, appellant testified on his own behalf. Defense counsel first elicited concessions from appellant that he had previously served time in prison as a result of theft-related convictions.[4] An admitted "thief," appellant qualified this characterization with testimony that he had never been violent and had never threatened violence either in the past or as alleged in the instant charges. (Tr. 276, 313.)
 {¶ 65} With respect to Mr. Lageman's accusations, appellant testified that they met a day earlier, on January 10, 2002, at the Ohio Union on campus. Appellant told him that a friend of his had computer game consoles to sell; he offered to sell Lageman a Sony Playstation 2 game console and some game cartridges. Lageman expressed interest, and the two agreed to meet in Lageman's dorm room the next day.
 {¶ 66} Appellant claimed that he told Lageman the "deal" and that Lageman knew the items were stolen — "hot." Appellant testified that he told Lageman that his friend[5] was actually the one who had the merchandise; this friend was able to obtain the merchandise because he worked at a Best Buy store. (Tr. 279, 281.)
 {¶ 67} According to appellant, when he arrived at Mr. Lageman's residence hall, the door was open. He walked in and went to Lageman's dorm room; that door was also open. On cross-examination, appellant explained that the first door — the door to the residence hall — was held open with a "little door stopper in it." With respect to Lageman's dorm room, he was not surprised to find that door open as well because Lageman was expecting him after their arrangements made the previous day. (Tr. 315-316.)
 {¶ 68} Appellant's testimony regarding the phone calls to and subsequent meeting with his friend is, in some respects, consistent with Mr. Lageman's. However, appellant denied making any threats at any time toward Lageman.
 {¶ 69} According to appellant, Mr. Lageman brought along a duffel bag to conceal the stolen merchandise he would soon be buying from appellant's friend. When appellant's friend drove up, appellant told Lageman to give the money to his friend and appellant gave his friend the duffel bag that Lageman had brought with him. The friend returned the duffel bag to appellant. Appellant's friend drove away alone. According to appellant, after the transaction appeared to be completed, he and Lageman walked down an alley together where appellant returned Lageman's duffel bag to him because Lageman wanted to be "discreet" about the deal. They then went their separate ways.
 {¶ 70} Appellant later learned that Lageman claimed that his friend had not put the merchandise in the bag. Appellant believed all along that his friend had put the actual merchandise in the bag. Appellant admitted receiving a portion of the money ("$60") from his friend later that night. (Tr. 327.)
 {¶ 71} On cross-examination, appellant testified that Mr. Lageman did actually receive what he paid for that day. "David Lageman knows he got what he bought[,]" according to appellant. (Tr. 326.)
 {¶ 72} The next set of charges against appellant stemmed from events occurring on January 21, 2002, again initiated on the OSU campus. Appellant was indicted on four counts arising from the January 21 incidents involving students Aaron Mochon (the alleged victim of one count of aggravated robbery and two counts of robbery) and Al Sherif Ibrahim (the named "person * * * present" as to one burglary count); however, appellant was convicted only of the latter burglary count related to the theft of Ibrahim's money.[6]
 {¶ 73} Aaron Mochon, 19-years-old at the time of trial, was also an OSU student when he met appellant. At the time, Mochon lived in a suite with seven others on the 20th floor of Morrill Tower, a 24-floor campus dormitory housing mostly freshmen. Mr. Ibrahim lived down the hall of the same floor in another suite. Access to "every entrance" into Morrill Tower is also generally gained via a key card. There are also generally persons who work a first-floor "front desk." (Tr. 139.)
 {¶ 74} Mr. Mochon testified that at approximately 1:10 p.m. on January 21, 2002, appellant approached him when the two were in the vicinity of Ohio Stadium, near Mochon's dorm. Appellant identified himself as "Marcus," and claimed that he was a "Best Buy" employee who was trying to sell an "overstock" of Playstations and Xboxes. Mochon thought that appellant might be another resident of his dorm because appellant "was walking in the same direction" he was "at the time." However, appellant never stated or otherwise indicated that he lived there. (Tr. 139-144, 146-147.) Mochon testified that he would not have let appellant into the building if he had known that appellant was not actually trying to sell these things. (Tr. 162-163.)
 {¶ 75} Mr. Mochon acknowledged that appellant told him that the merchandise "may be stolen." (Tr. 148.)
 {¶ 76} Mr. Mochon told appellant that he did not have money to buy anything and appellant then asked if Mochon knew of anyone who might be interested. Mochon told appellant that he would check with his roommates, in exchange for a "finder's fee" or "commission." (Tr. 144, 167.)
 {¶ 77} Appellant and Mr. Mochon went to the 20th floor of Morrill Tower. They entered the doors by Mochon's "swip[ing]" his key card. Although none of Mochon's roommates were interested, "Sherif" Ibrahim and his roommate were; they wanted two Playstations. Ibrahim gave Mochon $300 for both, loaning his roommate the cash. (Tr. 144-148.)
 {¶ 78} According to Mr. Mochon, after getting the money from Mr. Ibrahim, Mochon and appellant left the dorm together, ostensibly to get the items for Ibrahim. With Mochon driving his car, they went to an apartment where appellant indicated they would be picking up the Playstations; however, appellant returned to the car and told Mochon they would have to wait until later. They next drove to the house of a friend of appellant's in Worthington, where they "hung out" with some other men for over two hours. They then went to a "warehouse" near a Chipotle's Restaurant. Appellant exited the car and was gone for about ten minutes. When appellant returned, he got back in the car, pulled a gun out of his pocket, pointed it at Mochon, and said, "Give me the money." Mochon complied, handing him the $300. Appellant got out of the car and walked away. When Mochon returned to his dorm, he told Ibrahim about what happened; they called the police. (Tr. 145-158, 174.)
 {¶ 79} On cross-examination, Mr. Mochon provided a few more details regarding his "commission" arrangement with appellant. Specifically, Mochon testified, "I was going to get one [Playstation] for each one I sold." (Tr. 167.)
 {¶ 80} Although Mr. Mochon initially could not recall telling anyone that he and the others were drinking while they were hanging out at the Worthington house, he did concede that he told a defense investigator that "there was drinking and smoking" going on there. When asked what kind of "smoking," Mochon testified that it "* * * smelled like marijuana." (Tr. 168, 170-171.)
 {¶ 81} In further response to the defense investigator's questions, Mr. Mochon denied any knowledge of claims that he and appellant had gone to Worthington High School that afternoon to pick up two girls and that the four of them eventually went to a Motel 6. (Tr. 187-188.)
 {¶ 82} Mr. Mochon clarified on cross-examination that at no time did he ask appellant to leave his dorm room or Morrill Tower when appellant went in with him. (Tr. 179.) He also added that although he spent "three or four hours" with appellant that afternoon, he never saw a gun until appellant "drew it on [him]" later. (Tr. 182.)
 {¶ 83} Appellant's testimony regarding his contact with Aaron Mochon is, again, consistent in some initial detail. Specifically, appellant admitted that he went to Mochon's dorm to find a "buyer" in a similar scheme but, again, claimed that he intended for the sale to be consummated.
 {¶ 84} According to appellant, he and Mr. Mochon left the dorm and went to someone's apartment. Mochon gave appellant the $300; however, no one was home at the time. They needed to wait for awhile, so Mochon agreed with appellant that they should get some beer and pot.
 {¶ 85} According to appellant, he and Mr. Mochon picked up two girls at a high school in Worthington. Mochon used Mr. Ibrahim's money to buy beer at Kroger and marijuana from someone behind a nearby Motel 6. Mochon paid for a room at the motel, again using Ibrahim's money. They drank beer and smoked marijuana inside the motel room. Mochon paid appellant more money for more marijuana. Since there was only $50 left of the $300 Mochon had, the plan to buy the Playstations was over. When they were done partying at the motel, the men dropped the girls off and went to the restaurant, Chipotle's. Mochon went in, but appellant just walked away. Appellant denied returning to the car to rob Mochon. According to appellant, Mochon made up the "robbery" story because he had been gone for some six hours of partying and needed to give Ibrahim some excuse for returning empty-handed. (Tr. 291-300.)
 {¶ 86} The defense called Aleisha Gipe, a manager of the Motel 6, to testify. Ms. Gipe identified a Motel 6 record indicating that appellant had signed and paid for a room on January 21, 2002, sometime after 3:00 p.m. On cross-examination, however, she testified that the document does not conclusively reveal what time a "Mark Hayes" signed in that day; he could have checked-in between 3:00 and 11:00 p.m. (Tr. 479-480, 491-492.)
 {¶ 87} The final count of the indictment in this case, second-degree burglary (specifying one "Valdez Russell" as the "person present"), arose from similar accusations arising out of a February 5, 2002 incident at Taylor Tower, another campus dormitory.
 {¶ 88} Tim Cooper, an OSU police detective, was the lead detective on these cases. The campus police were aware that a series of alleged robberies had occurred involving students being lured off campus in a scam to "buy" Playstations and Xboxes.
 {¶ 89} On the afternoon of February 5, 2002, Detective Cooper received a report of a man going through Taylor Tower, trying to "sell" the computer consoles. Cooper and another officer went to the dorm but could not find the suspect. However, shortly thereafter, a similar report was received regarding a suspect in the Ohio Union. When Cooper arrived at the Union, he found appellant and another man leaving the building. Appellant told the officers that the other man had offered to sell him some electronics equipment. While the officers were speaking to appellant, the dorm director of Taylor Tower arrived and identified appellant as the person who had been inside the dorm earlier that day. Appellant was then arrested. (Tr. 193-197.)
 {¶ 90} The state's final witness in its case-in-chief was Valdez Russell, a "resident hall director" for Taylor Tower. He testified regarding his recollection of the events of February 5, 2002, as first alluded to by Detective Cooper.
 {¶ 91} According to Mr. Russell, Taylor Tower, like the other dorms, requires a key card to gain entry via several entrances. Again like the other dorms, there is an information desk near the main entrance to assist visitors. Russell was initially alerted to a potential problem involving the dorm's "no solicitation" policy on February 5 and, in turn, called the OSU Police. (Tr. 230-234.)
 {¶ 92} Mr. Russell saw appellant and asked if he could be of assistance. Appellant replied, "No, I'm here to see Craig." According to Russell, "Craig" was one of the dorm's employees, who happened to be standing right there with them at the time. Appellant did not indicate any recognition of Craig and, likewise, Craig did not know who appellant was; appellant then left the building. (Tr. 240-241.)
 {¶ 93} Mr. Russell testified that "no solicitation" signs were posted throughout Taylor Tower, including the lobby where he had his "brief encounter" with appellant. (Tr. 241.)
 {¶ 94} When OSU Police questioned appellant outside the Ohio Union, Mr. Russell went there and identified appellant as the man who had been in Taylor Tower. According to Russell, he had been concerned about appellant trying to sell computer games and/or consoles because OSU Police had alerted resident managers to a similar scheme in which students had been taken advantage of. (Tr. 242-246.)
 {¶ 95} According to appellant, he entered Taylor Tower when a female student who was going inside agreed to let him follow. When he went in, he talked with Craig Sweeney, a resident assistant at the front desk; appellant asked whether he knew anyone who might be interested in buying a game console. Sweeney directed appellant to the second floor. When appellant returned to the front desk awhile later, Sweeney asked him to leave.
 {¶ 96} Al Sherif Ibrahim was called as a defense witness. He corroborated the testimonies of appellant and Aaron Mochon insofar as he confirmed his giving $300 to Mochon to buy two Playstations. (Tr. 446-447.)
 {¶ 97} According to Mr. Ibrahim, Mochon returned four or five hours later, informing Ibrahim and others that appellant had pulled a gun on him, demanding Ibrahim's cash which Mochon had been carrying. Ibrahim believed that Mochon had mentioned something about them having gone to a hotel, although he was not "sure" about this. According to Ibrahim, Mochon looked "pretty shook up" and might have been crying. Ibrahim testified that Mochon did not smell like he had been drinking or smoking pot. (Tr. 446-455.)
 {¶ 98} The prosecution called Craig Sweeney as a rebuttal witness. Sweeney, who worked with Valdez Russell at Taylor Tower's front desk, identified appellant as the man he saw on February 5, 2002, walking back and forth in the lounge and lobby area. According to Sweeney, appellant indicated that he was waiting for his friend "Mike." Appellant also told him that he was working at "Best Buy" and had seen a coworker sorting through boxes containing an "overshipment" of Playstations and Xboxes. Appellant said that he "wanted in" on them because he could make some money selling them for $150 each. Appellant did not offer to sell anything to Sweeney; however, people in his dorm had been approaching him to ask about them. Appellant told Sweeney that he lived in Lincoln Tower. Appellant asked if Sweeney knew of anyone who might be interested in buying some, and Sweeney said, "No." According to Sweeney, appellant kept asking questions; so, in order to get him away from the front desk, Sweeney told appellant he could go to the second floor. Sweeney then called a coworker, who then called Russell. Russell told Sweeney to call the police. (Tr. 497-500, 507-508, 516.)
 {¶ 99} With this factual background, we address the merits of appellant's first and second assignments of error challenging the sufficiency and weight of the evidence supporting his convictions.
 {¶ 100} Appellant's first assignment of error challenges his two robbery convictions.
 {¶ 101} Appellant's robbery convictions are based upon the events involving David Lageman on January 11, 2002. Appellant argues that Lageman's testimony, "viewed in a light most favorable to the prosecution," establishes that if appellant uttered a "threat" (i.e., "get the gun and blast him"), it happened only after the completion of all of the elements of theft by deception had occurred. In other words, appellant contends that no robbery was proven because the theft occurred prior to any threat of harm or force. Appellant thus would have us hold that the offense of robbery requires "simultaneity" — that the threat occur concomitantly or simultaneously with the theft offense itself.
 {¶ 102} Appellant relies upon State v. Davis (1983),6 Ohio St.3d 91, in which the Supreme Court of Ohio held, at paragraph one of the syllabus:
 {¶ 103} "The use or threat of immediate use of force element of the offense of robbery, as expressed in R.C. 2911.02(A), is satisfied if the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed."
 {¶ 104} Appellant seizes upon a portion of the Davis syllabus, the "part with his property" language, to support his contention that the threat must necessarily precede or coincide with the theft. The state counters that appellant's reliance upon this language of Davis is misplaced because the case only exemplifies one particular scenario in which the court construed a particular "threat" as "satisfying" the threat element. We agree.
 {¶ 105} In Davis, the court had no reason to address the "fleeing immediately after" or threat-after-theft scenario because the case did present a "simultaneous" robbery situation. The victim in Davis was threatened with harm or force as a matter of inducement to "part with his property." The Davis syllabus does not purport to be dispositive of all potential robbery scenarios. Indeed, the Davis court had no need to even quote within its text that portion of the statute — "or in fleeing immediately after" — which we find ultimately dispositive of appellant's argument.
 {¶ 106} While appellant's position may be consistent with certain common law principles, a plain reading of the statute itself, particularly that language emphasized above, reveals that no such simultaneity is now required. Contrary to appellant's contention, the statute expressly and unequivocally prohibits threats of force or physical harm in both attempting or committing a theft offense, "or in fleeing immediately after" the attempt or commission of the offense.
 {¶ 107} By its verdict, the jury effectively rendered a finding in accord with Mr. Lageman's testimony that appellant, after conning Lageman out of his money, threatened Lageman as he demanded his money back from appellant and his accomplice. The threat induced Lageman to desist from his demands, thereby enabling appellant and his accomplice to get away — to "flee." These facts fall squarely within the reach of the robbery statute.
 {¶ 108} Based upon the foregoing, we conclude that the evidence, viewed in a light most favorable to the prosecution, was sufficient such that the jury rationally could have found the essential elements of robbery proven beyond a reasonable doubt. Jenks, supra, paragraph two of the syllabus. Furthermore, we cannot say that appellant has demonstrated that the jury "lost its way" in convicting appellant of robbery such that a "manifest miscarriage of justice" occurred. Thompkins, supra, citing State v. Martin (1983), 30 Ohio App.3d 172. The jury, acting well within its province, ultimately resolved credibility issues in favor of Mr. Lageman's version of the facts and rejected appellant's. Therefore, we find that appellant's robbery convictions were supported by sufficient evidence and were not against the manifest weight of the evidence.
 {¶ 109} The first assignment of error is overruled.
 {¶ 110} Appellant's second assignment of error challenges the sufficiency of the evidence underlying his three burglary convictions.
 {¶ 111} Appellant's three convictions for burglary arose from his three visits to the OSU dormitories discussed above. The indictment contained language of the burglary statute implicating both forms of burglary as second-degree felonies. To sustain these convictions, the evidence must establish proof of the elements contained in the burglary statute, R.C. 2911.12(A), set forth above.
 {¶ 112} Based upon the statutory definitions of "deception" and "trespass" set forth infra, we find that the record presents more than sufficient evidence upon which the jury could reasonably conclude that appellant, by deception, trespassed in the dormitories in order to initiate his scam. As detailed above, there was ample evidence presented to support a finding that appellant gained authorization to "enter or remain on the * * * premises" by "false or misleading representation[s] * * *." R.C. 2911.21(A) and (C) (Emphasis added); R.C. 2913.01(A). Again, we are mindful that it is "no defense to a charge [of trespass] that the offender was authorized to enter or remain on the premises * * * when such authorization was secured by deception." R.C. 2911.21(C). Accordingly, even were we to find the evidence somewhat lacking as to the precise manner of appellant's initial entry into the students' residence halls/dormitories, the jury could reasonably find that he was permitted to remain on the premises via his deception or misrepresentations to the students.
 {¶ 113} The record falls short, however, of establishing sufficient evidence of the remaining critical element of second-degree burglary — a purpose to commit an offense "in" the occupied structure.
 {¶ 114} On appeal, the state "concede[s] that the burglary charges here required proof that [appellant] intended to commit a criminal offense within these occupied structures." (Brief at 21.)
 {¶ 115} The record is devoid of evidence sufficient to prove that appellant intended to commit an offense inside the dormitories. According to all of the prosecution's witness, one common characteristic of appellant's "scheme" was to "lure off campus" potential "buyers." Appellant's testimony was also consistent, at least insofar as he admitted that he intended to sell the students "hot" merchandise when they arrived at off-campus locations to meet his accomplice.
 {¶ 116} Based upon our careful review of the evidence, we are compelled to conclude that the state failed to establish this critical element of burglary as a second-degree felony. However, as the state suggests, the record does support conviction under the lesser offense in division (A)(4), the only burglary provision not requiring proof of intent to commit a crime "in the structure" or "in the habitation." Specifically, R.C. 2911.12(A)(4), a felony of the fourth-degree, provides:
 {¶ 117} "(A) No person, by * * * deception, shall * * *:
 {¶ 118} "* * *
 {¶ 119} "(4) Trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present."
 {¶ 120} Appellant's second assignment of error is sustained to the extent indicated herein. Appellant's convictions for burglary as second-degree felonies are vacated and this cause is remanded to the trial court with instructions to conduct a new sentencing hearing and to enter judgment finding appellant guilty of the burglaries as fourth-degree felonies.
 {¶ 121} By his third assignment of error, appellant contends that he was denied a fair trial as a result of prosecutorial misconduct. Specifically, appellant points to certain instances of purported misconduct by the prosecution during cross-examination and closing arguments.
 {¶ 122} "Whether a prosecutor's remarks constitute misconduct requires analysis as to (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected an accused's substantial rights." State v. Noling (2002), 98 Ohio St.3d 44, 2002-Ohio-7044 at ¶ 91, citing State v. Smith (1984), 14 Ohio St.3d 13; State v. Lott (1990), 51 Ohio St.3d 160. "The touchstone of this analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Noling, quoting Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940.
 {¶ 123} Appellant takes issue with a particular line of questioning which, he contends, amounted to prosecutorial misconduct. Appellant points to allegedly improper questioning and remarks made by the prosecution first upon cross-examination of appellant which amounted to "unwarranted accusations of a fabricated defense." Specifically, the prosecution questioned appellant about appellant's receipt and review of the state's discovery disclosure packet, which included the names and statements of prosecution witnesses. The prosecution sought to demonstrate that appellant's trial testimony and overall defense were tailored — "fabricated" — to correspond where possible with information provided in discovery. Defense counsel's "relevancy" objection to this line of cross-examination was overruled after a sidebar discussion in which the prosecution argued that he sought to show that appellant's testimony amounted to a "recent fabrication."
 {¶ 124} In a similar vein, the prosecution stated the following during closing arguments:
 {¶ 125} "* * * [A]s you know, the defense by his own admission, the defendant had a complete copy of discovery of the witness summaries, statements and was able to then manufacture his defense." (Tr. 531.)
 {¶ 126} The prosecution's remarks were clearly intended to leave the jury with the impression that appellant had acted improperly somehow by reviewing the discovery materials provided by the state. However, an accused has a well-established right to receive discovery from the prosecution pursuant to Crim.R. 16 and, of course, also has the right to testify as a witness on his own behalf. An accused should not be subjected to accusations of fabrication or perjury based solely upon his exercising those rights.
 {¶ 127} Notwithstanding the foregoing, however, the prosecution also has a right to attempt to impeach a defendant who chooses to exercise his right to testify. While an accused should be able to exercise his rights without outright disparagement for doing so, we cannot say that the prosecution's "tailored defense" line of questioning rose to the level of misconduct or impropriety.
 {¶ 128} Even were we to deem the prosecution's attacks on appellant's credibility vis-a-vis appellant's receipt and review of the discovery materials as improper, appellant has failed to demonstrate the requisite prejudice resulting from these isolated instances.
 {¶ 129} Under this assignment of error, appellant also accuses the prosecution of misconduct during closing argument by purportedly impugning the integrity of defense counsel by suggesting that counsel improperly "coached" defense witness Al Sherif Ibrahim. Specifically, appellant points to a brief passage contained in the prosecution's closing argument wherein the prosecution questioned the veracity of Ibrahim's recollection of hearing Mr. Mochon say "something about a motel" when Mochon first called the police (as discussed above in our review of the evidence). The prosecution had suggested that it was possible that a defense investigator's questioning of Ibrahim led to Ibrahim's "confusing" or imprecise testimony about when and what he heard, if anything, about a "motel." Since Ibrahim apparently did not mention the "motel" information until after he had spoken with the defense investigator, the prosecution could legitimately comment upon the weight to be given to this witness's testimony.
 {¶ 130} We do not read the challenged portions of the prosecution's remarks regarding Mr. Ibrahim's testimony as being improper or as impugning defense counsel.
 {¶ 131} Appellant's final argument under this assignment of error[7] alleges further impropriety on the part of the prosecution in its "misleading" questioning of appellant on cross-examination about appellant's failure to contact David Lageman after appellant was indicted. The clear import of this line of questioning was to imply that appellant, if innocent, would have contacted Lageman to apologize and explain that it was appellant's "friend," not appellant, who "ripped him off" and perhaps try to persuade Lageman to "drop" the charges.
 {¶ 132} We agree that these questions, posed by the prosecution repeatedly over several pages of transcript, were misleading and inappropriate. Not only does an accused not have any obligation to contact an alleged crime victim (as suggested by the prosecution), there was a "no contact" order entered at appellant's arraignment which effectively directed appellant to stay away from alleged victims. Violation of such an order could, as suggested by appellate counsel, expose appellant to additional charges (i.e., hindering prosecution or intimidating a witness).
 {¶ 133} Again, however, appellant has not demonstrated the requisite prejudice resulting from this improper line of questioning. In responding to the prosecution's line of questioning in this regard, appellant was able to offer probative testimony on cross-examination in which he disavowed any knowledge of the "rip-off" scheme. Viewed in context of the overall, fairly lengthy trial, we cannot find that the prosecution's instances of inappropriate questioning or argument, viewed either in isolation or cumulatively, amounted to prosecutorial misconduct.
 {¶ 134} The third assignment of error is overruled.
 {¶ 135} Appellant argues in his fourth assignment of error that he was denied a fair trial as a result of the trial court's allowance, over defense objection, of "extensive hearsay testimony of other similar robberies allegedly committed by" appellant. In other words, appellant contends that the trial court committed prejudicial error in allowing inadmissible "other acts" evidence.
 {¶ 136} The testimony at issue was elicited by the prosecution in its examination of Valdez Russell, the residence hall director of Taylor Tower. Over defense objection, Russell was permitted to testify that he had been "concerned" when he met appellant because he (Russell) was aware of reports of previous incidents involving an individual who was running the same sort of scheme. Russell obtained this information via fliers and e-mails from the OSU Police Department. Russell was concerned enough that he informed his coworkers to contact the police when appellant was hanging around Taylor Tower on February 5. Appellant cites the following testimony as particularly egregious:
 {¶ 137} "It was of concern to me as it was earlier in the academic year that an individual was on campus doing the same thing and took advantage of our students as to relates to taking money, as it relates to in some ways forcefully physically attacking a student, or just the shear [sic] force of intimidation." (Tr. 245; emphasis added.)
 {¶ 138} It is well-established that the admission of evidence lies within the broad discretion of the trial court. A reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has resulted in material prejudice. Therefore, our inquiry is limited to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues about which appellant complains. State v. Issa (2001),93 Ohio St.3d 49, 64; State v. Barnes (2002), 94 Ohio St.3d 21, 23.
 {¶ 139} Pursuant to Evid.R. 404(B), "evidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. It may, however, be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 140} In arguing defense counsel's objection to this testimony, the prosecution argued that he was offering it to prove the witness's "state of mind," ultimately causing the witness to contact the police and to go to the Ohio Union to make an identification of appellant. (Tr. 244.)
 {¶ 141} Had the witness's testimony been limited to explaining why, in fairly general terms, he had been on such notice to give rise to his "concern" about similar criminal schemes, admission of such testimony would not be troublesome. However, we agree that the above-quoted testimony, which could have left the jury with the impression that appellant had been implicated in other incidents involving "physical attacks" and the "force of intimidation," should have been subject to a limiting instruction about its proper use. Nonetheless, we cannot find an abuse of discretion in allowing the witness to explain the motivation for his actions and we cannot find prejudice from a theoretical misuse by a juror of the testimony.
 {¶ 142} Stated somewhat differently, given the state of this record, including those eyewitness accounts of those who identified appellant as the man who arranged the "sales" and/or entered their residence halls to arrange "sales," we must conclude that the admission of this portion of Valdez Russell's testimony without a limiting instruction was harmless beyond a reasonable doubt.
 {¶ 143} The fourth assignment of error is overruled.
 {¶ 144} Appellant's fifth assignment of error challenges as "plain error" the trial court's "defective and incomplete" jury instructions. Appellant raises the issue as plain error due to trial counsel's failure to object to same.
 {¶ 145} Insofar as appellant attacks the trial court's purportedly erroneous jury instruction as to the burglary counts, such issue is rendered moot by our disposition of the second assignment of error. For the reasons set forth in that discussion, in order for the state to prove burglary as a second-degree felony (as convicted), we agree that the state was required to prove that appellant intended to commit a crime "in the structure" or "in the habitation" and the jury should have been instructed accordingly.
 {¶ 146} Appellant also challenges the trial court's instruction as to robbery as being "incomplete." Appellant bases this argument upon the same contention raised under his first assignment of error — that the robbery instruction should have included the "simultaneity" requirement. However, having found no merit to the "simultaneity" argument, appellant was necessarily not entitled to such an instruction. As noted by appellant, the trial court's robbery instruction "tracked the statutory language." The robbery instruction was sufficient.
 {¶ 147} The fifth assignment of error is overruled.
 {¶ 148} By his sixth and final assignment of error, appellant argues that he was denied the effective assistance of counsel and, therefore, denied a fair trial.
 {¶ 149} The well-established standards by which we are bound in reviewing claims of ineffective assistance of trial counsel presents a significant burden upon an appellant. Reversal of convictions on grounds of ineffective assistance of counsel requires that appellant show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense so as to deprive appellant of a fair trial. Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052; accord State v. Bradley (1989), 42 Ohio St.3d 136. "To establish prejudice, `the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial have been different.'" State v. Tibbets (2001), 92 Ohio St.3d 146,164, quoting Bradley, supra at paragraph two of the syllabus. See, also, Noling, supra at ¶ 108. Thus, in order to find prejudicial ineffectiveness, appellant must demonstrate that such purported ineffectiveness was outcome-determinative of his trial.
 {¶ 150} Appellant urges a finding of ineffective assistance of trial counsel based upon counsel's failure to object to two instances of alleged prosecutorial misconduct, as well as to the "defective" jury instructions.
 {¶ 151} The instances of alleged prosecutorial misconduct have been discussed and rejected under appellant's third assignment of error. Although we found some remarks and/or lines of questioning by the prosecutor to be improper, we nonetheless determined that such improprieties did not rise to the level of prosecutorial misconduct. Therefore, trial counsel's failure to object is effectively inconsequential.
 {¶ 152} As discussed above under the fifth assignment of error, any defect in the jury instructions related to the burglary counts is rendered moot because of our disposition and remand as to those convictions. With respect to alleged defects in the instructions on robbery, we have already deemed those instructions as being sufficient. Accordingly, any claimed deficiencies on the part of trial counsel in failing to object to the jury instructions are not outcome-determinative in this case.
 {¶ 153} The sixth assignment of error is overruled.
 {¶ 154} The first, third, fourth, fifth and sixth assignments of error are overruled. Having sustained the second assignment of error to the extent indicated herein, the judgment of the trial court is reversed in part and this cause is remanded to the trial court with instructions to conduct a new sentencing hearing consistent with this opinion.
Judgment affirmed in part, reversed in part and cause remanded with instructions.
KLATT and BROWN, JJ., concur.
[1] Appellant correctly notes that some language of the indictment's burglary counts indicates that the state was pursuing a theory that appellant violated division (A)(1) of the statute. However, as clearly evidenced by the jury instructions, verdicts and entry journalizing appellant's convictions, division (A)(2) was the prevailing "theory" of the burglaries. However, based upon the evidence presented in this case, both divisions (A)(1) and (A)(2) apply with equal force and effect. Both are second-degree felonies and both are consistent with the state's theory that appellant's offenses occurred in dormitories ("habitations") wherein other persons were actually "present" at the time.
[2] The judgment entry journalizing appellant's burglary convictions designates "(A2)" as the provision violated by appellant.
[3] As indicated infra, appellant was not convicted of any firearm violations.
[4] On cross-examination, appellant clarified that he had "been to prison three times" for theft-related convictions; he also admitted that he had served time for "escape." (Tr. 307-309.)
[5] On cross-examination, appellant eventually identified this friend as "Adam Macklin." According to appellant, Macklin had since moved back to Cleveland. (Tr. 318.)
[6] As indicated infra, the jury was declared "hung" as to the three counts naming Aaron Mochon the victim of robbery and aggravated robbery. Al Sherif Ibrahim, as detailed below, was eventually called as a defense witness.
[7] Appellant also challenges as improper the prosecution's "misstating the law on burglary" because the prosecution indicated that the state did not have to prove that appellant intended to commit a crime "in" the habitation or occupied structure. Given our disposition of the second assignment of error (successfully challenging the sufficiency of the second-degree burglary convictions), this issue is moot.